DA 10-0174

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 284

ROBERT F. EHRMAN,

        Plaintiff and Appellant,

  v.

KAUFMAN, VIDAL, HILEMAN & RAMLOW, PC,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                     In and For the County of Flathead, Cause No. DV 08-475C
                     Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Floyd D. Corder, Corder Law PLLC, Great Falls, Montana

        For Appellee:

        Mikel L. Moore; Christensen, Moore, Cockrell, Cummings & Axelberg, P.C.,
        Kalispell, Montana

Submitted on Briefs:  November 4, 2010

Decided:  December 30, 2010

Filed:

_____
                         Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 The Eleventh Judicial District Court, Flathead County, granted summary judgment to Kaufman, Vidal, Hileman & Ramlow, P.C. ("KVHR"), concluding that Robert Ehrman's (Ehrman) legal malpractice claim against KVHR was barred by the three year statute of limitations.

¶2 We reverse and remand for further proceedings consistent with this Opinion.

## BACKGROUND

¶3 In January 2002, Ehrman sought legal advice from KVHR regarding whether he could acquire William L. Baillie's (Baillie) boat dock rights located on Bigfork Harbor on Flathead Lake. The question Ehrman presented to KVHR was one of contract interpretation. In 1991, Baillie had reserved the dock rights in a Contract for Deed when he sold the property where the dock was located. The Contract for Deed reserved use of the dock and access to it to Baillie and his heirs. The Contract for Deed also provided that, subject to the terms of the agreement, either party could assign his or her interest and neither party could unreasonably withhold consent to such assignment.

¶4 Ehrman was not Baillie's heir and was specifically concerned with whether he could acquire Baillie's dock rights under the Contract for Deed. James Ramlow (Ramlow), a KVHR attorney, advised Ehrman that he could acquire the dock rights, despite his non-heir status, and drafted a "Lease and Agreement for Assignment of Easement to Boat Dock" ("Agreement"). Under the Agreement, Ehrman would lease Baillie's dock rights until

2

Baillie obtained consent to assign, upon which Ehrman would acquire the dock rights. Ehrman and Baillie executed the Agreement in June 2002.

¶5     Over the next one and a half years, Ehrman made lease payments and enjoyed use of the dock without incident. However, in late 2003 or early 2004, William G. Myers, Jr. (Myers), a subsequent purchaser of the property, informed Ehrman that he would never consent to assignment of the dock rights. His actions prompted Ehrman to record the Agreement in July 2004. Myers proceeded to harass Ehrman whenever he or his guests used the dock.

¶6     In July 2005, Myers' attorney contacted Ramlow and arranged a meeting. After the meeting, Ramlow wrote to Ehrman, informing him that Myers disputed Baillie's ability to transfer his dock rights to anyone other than one of his heirs, but that Myers was willing to enter into a new lease agreement with Ehrman. In a subsequent letter to Ehrman, dated September 6, 2005, Ramlow advised Ehrman of his options:

> Your options are to do nothing and defend your right to the lease and assignment of dock and access rights. That may be costly . . . . In my experience, it would not be safe to advise you to plan on spending any less than 10,000 to 15,000 for litigation costs. *If you win, which I think you will*, an appeal by Myers to the Supreme Court could cost an additional 4,000 to 5,000. Another option is to attempt to negotiate a new lease with Myers . . . . Before negotiating, I think that some letter should be sent to his attorney challenging Myers' refusal to give consent to the lease and assignment.

(Emphasis added.) Ehrman elected to defend the Agreement.

¶7     In 2006, Myers and other owners of the property sued Ehrman, seeking a declaratory judgment that Ehrman had no interest in the dock rights. Both parties filed motions for summary judgment. In August 2007, the district court ruled against Ehrman, concluding that

the dock rights were only reserved to Baillie and his heirs, and it was not unreasonable, as a matter of law, for the property owners to refuse to consent to the assignment of the dock rights to a non-heir.

¶8 KVHR subsequently withdrew from representing Ehrman. Ehrman hired his current counsel and chose not to appeal the declaratory judgment. Instead, Ehrman sued KVHR for legal malpractice in April 2008. In March 2010, the District Court granted KVHR's motion for summary judgment, concluding the lawsuit was barred by the applicable three year statute of limitations. Consequently, the lawsuit was dismissed with prejudice.

¶9 The sole issue on appeal is whether the District Court erred in determining that Ehrman's legal malpractice claim was barred by the three year statute of limitations.

## STANDARD OF REVIEW

¶10 We review a district court's summary judgment ruling de novo, applying the same M. R. Civ. P. 56 criteria used by the district court. *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 16, 321 Mont. 432, 92 P.3d 620. Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c). Once the moving party accomplishes this, the burden shifts to the opposing party to prove, by more than mere denial and speculation, that a genuine issue of material fact exists and that the moving party is not entitled to judgment as a matter of law. *Spolar v. Datsopoulos*, 2003 MT 54, ¶ 11, 314 Mont. 364, 66 P.3d 284.

## DISCUSSION

4

¶11 Section 27-2-206, MCA, provides the statute of limitations for a legal malpractice action:

> An action against an attorney licensed to practice law in Montana or a paralegal assistant or a legal intern employed by an attorney based upon the person's alleged professional negligent act or for error or omission in the person's practice must be commenced within 3 years after the plaintiff discovers or through the use of reasonable diligence should have discovered the act, error, or omission, whichever occurs last, but in no case may the action be commenced after 10 years from the date of the act, error, or omission.

¶12 Further, we have held that the statute of limitations does not begin to run until both the "discovery rule" and "accrual rule" are satisfied. *Watkins Trust*, ¶ 40. The discovery rule begins the statute of limitations when the plaintiff discovers or should have discovered the negligent act. *Johnson v. Barrett*, 1999 MT 176, ¶ 11, 295 Mont. 254, 983 P.2d 925. The statute of limitations does not begin to run under the accrual rule until all elements of the claim have occurred. *Uhler v. Doak*, 268 Mont. 191, 196, 885 P.2d 1297, 1300 (1994). Thus, "the statute of limitations in a legal malpractice action does not begin to run until the negligent act was, or should have been, discovered, *and* all elements of the legal malpractice claim, including damages, have occurred." *Watkins Trust*, ¶ 40.

¶13 The District Court determined Ehrman was aware of the facts forming the basis of the malpractice allegation no later than July 2004 because he knew a problem existed with the Agreement (Myers and the other property owners were not going to consent to the assignment of the dock rights); therefore, the statute of limitations had already run when he filed suit in 2008.

5

¶14 On appeal, Ehrman argues that the statute of limitations did not begin to run until August 2007 when the district court granted summary judgment to Myers and the other property owners. Ehrman asserts the discovery rule does not bar his claim because he justifiably relied on his attorney's advice, and the attorney-client fiduciary relationship excuses earlier discovery of the negligent act. He also argues his claim is not barred by the accrual rule because he did not suffer any actual injury until August 2007. KVHR maintains that by July 2004, Ehrman was aware of facts sufficient to put him on inquiry notice of a potential claim. KVHR further argues that Ehrman accrued damages—denial of quiet enjoyment of his dock rights—in 2004, when Myers began harassing Ehrman and his guests.

*A. Discovery Rule*

¶15 The existence of a fiduciary relationship, such as that of attorney and client, may excuse the discovery of an attorney's alleged negligent act and toll the statute of limitations. *Estate of Watkins v. Hedman*, 2004 MT 143, ¶¶ 18-21, 321 Mont. 419, 91 P.3d 1264. In *Estate of Watkins*, Carolyn Watkins retained attorney Lacosta to prepare an estate plan for Carolyn and her husband Stanley. As part of the estate plan, Lacosta prepared a trust that she advised Carolyn was revocable (pursuant to Carolyn's wishes that she retain flexibility in managing assets) when, in fact, it became irrevocable upon Stanley's death in 1992. Lacosta continued to advise Carolyn the trust was revocable until 1995, when Carolyn was advised by another attorney that it was irrevocable, and Lacosta admitted it was irrevocable. *Id.* at ¶¶ 4-9.

6

¶16     Given the confidential relationship that existed between Carolyn and Lacosta, we excused her delayed discovery of the negligent act and concluded the statute of limitations was tolled until 1995 when Carolyn discovered the trust was irrevocable. *Id.* at ¶ 34. We noted that Carolyn's mistake was her reliance on Lacosta's advice. However, she was entitled to trust her attorney's advice. *Id*. at ¶ 21. In reaching our conclusion, we noted what the United States Supreme Court observed long ago:

> There are few of the business relations of life involving a higher trust and confidence than that of attorney and client . . . and it is the duty of the court . . . to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.

*Id*. at ¶ 19 (quoting *Stockton v. Ford*, 52 U.S. 232, 247, ___ S. Ct. ___ (1851)).

¶17     Lawsuits are based upon different interpretations of law and fact, and a client is entitled to rely on the advice of his or his attorney. In the midst of representation, a client should not be required to sue his or her attorney for malpractice merely because the opposing party has presented countervailing arguments. However, a client's right to rely on his or her attorney's advice is not absolute, and delayed discovery is only excused until the client reasonably believes that he or she is no longer being competently represented. *See id*. at ¶¶ 18-21. Thus, there is not an absolute rule for determining when the discovery rule is triggered. The determination of when a client knew or should have known that his or her attorney's advice was negligent is a fact-intensive inquiry particular to each case.

¶18     Turning to the facts of this particular case, we conclude Ehrman did not know, nor should he have known, of KVHR's alleged negligent act until August 2007. Ehrman testified he wholly relied on Ramlow's advice throughout the course of his representation:

7

All I ever did was listen to my attorneys. . . .  I'm smart enough to know I don't know the law, so I get the best counsel I can and listen to what they have to say.

. . .

There was never any question in my mind until the day that we lost the summary judgment that we weren't going to win that thing.  I was assured by them that [Myers and the other property owners] just hadn't read far enough. . . .  When I'd call and talk to [Ramlow], he'd say, No.  Don't worry about it.

¶19 Here, Myers' countervailing interpretation of the underlying Contract for Deed and challenges to the Agreement were insufficient to put Ehrman on notice of an alleged negligent act and trigger the discovery rule.  It was reasonable for Ehrman to rely upon Ramlow's advice until summary judgment was entered against him in August 2007.  At that time, he was clearly on notice that the advice he had received was incorrect and the Agreement was void.

*B.  Accrual Rule*

¶20  In *Uhler*, we held that all elements of a claim must have accrued in order for the statute of limitations to begin running:

> [T]o establish a cause of action for legal malpractice, there must be a showing that the attorney owed his client a duty of care, that there was a breach of this duty by a failure to use reasonable care and skill, *and that the breach was the proximate cause of the client's injury and resulted in damages*.

268 Mont. at 196, 885 P.2d at 1300 (quoting *Merzlak v. Purcell*, 252 Mont. 527, 529-30, 830 P.2d 1278, 1279-80 (1992)) (emphasis added).  The accrual rule is based on the rationale that "it is inherently illogical and unfair to require a plaintiff to file an action prior to the accrual of the cause of action because if a plaintiff filed suit when no actual damages had been sustained, the suit would properly be dismissed."  *Watkins Trust*, ¶ 49.  Further, actual

damages, not the mere threat of future damages, are required to begin the running of the statute of limitations under the accrual rule. *Id.* Additionally, in *Spolar*, we determined that although the client had been voicing his objections for over one year to the valuation method his attorney used in preparing proposed findings of fact and conclusions of law for the division of the client's marital estate, his claim did not accrue until the district court issued its order dividing the marital estate. *Spolar*, ¶¶ 5-7, 16.

¶21　Similarly in this case, Ehrman's damages did not accrue until the district court declared the Agreement null and void, enjoined Ehrman from using the dock, and quieted title in favor of Myers and the other property owners. If, as the District Court concluded, Ehrman's damages had accrued in July 2004, he would have had to sue for malpractice when he still had possession of and was using the dock rights—before he sustained any damages arising from Ramlow's interpretation of the Contract for Deed. Because the matter in dispute was related to the interpretation of a contract, and because Ehrman was not deprived of the possession or use of the dock rights until August 2007, we conclude his claim against KVHR did not accrue until that point.

## CONCLUSION

¶22　Reversed and remanded for further proceedings consistent with this Opinion.

/S/ MICHAEL E WHEAT

We Concur:

9

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS


Justice Jim Rice, dissenting.

¶23 I believe the Court overlooks critical facts, ignores controlling cases, and essentially adopts the "continuous representation" doctrine we expressly rejected in earlier cases as inconsistent with our statute.

¶24 We reached the opposite conclusion from the Court's holding today in the very similar case of *Peschel v. Jones*, 232 Mont. 516, 525-26, 760 P.2d 51, 56-57 (1988), and provided specific guidance about application of the discovery rule. There, the lawyer drafted an agreement for the purpose of resolving financing problems so that construction of the client's apartment complex could continue. *Peschel*, 232 Mont. at 518, 760 P.2d at 52. The agreement was entered in November 1979 and construction resumed in December 1979. *Peschel*, 232 Mont. at 518, 760 P.2d at 52. Ultimately, the agreement did not resolve matters and litigation between the client and the other contract party ensued. *Peschel*, 232 Mont. at 518, 525, 760 P.2d at 52, 56. The other party obtained a $72,000 judgment against the client, Peschel, in January 1984. *Peschel*, 232 Mont. at 525, 760 P.2d at 56. Peschel then filed suit against his former attorney, Jones, in November 1985. *Peschel*, 232 Mont. at 518, 760 P.2d at 52. Peschel argued—just as Ehrman argues—that "he did not discover the facts essential

10

to a cause of action until after January 25, 1984, when a district court decision found judgment for Martin Development and against Peschel in the amount of $72,000." *Peschel*, 232 Mont. at 525, 760 P.2d at 56.

¶25    We rejected Peschel's argument.  Noting Peschel's assertion that "he had knowledge of the acts, but did not have knowledge of the alleged negligence," *Peschel*, 232 Mont. at 525, 760 P.2d at 56, we explained that it was knowledge of the *facts* which was critical—not knowledge of a viable malpractice theory:

> As a matter of law, what is critical in determining when a legal malpractice action accrues is *knowledge of the facts essential to the cause of action, not knowledge of the legal theories* upon which an action may be brought.
>
> .   .   .
>
> *[I]t is the knowledge of facts rather than discovery of legal theory, that is the test.  The test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry*, or has the opportunity to obtain knowledge from sources open to his or her investigation.

*Peschel*, 232 Mont. at 525, 760 P.2d at 56 (emphases added, internal quotation marks omitted) (quoting *Burgett v. Flaherty*, 204 Mont. 169, 173-74, 663 P.2d 332, 334 (1983)). Thus, the "test" for determining whether the plaintiff-client "should have discovered" the problem is "whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry." *Peschel*, 232 Mont. at 525, 760 P.2d at 56.

¶26    In *Guest v. McLaverty*, 2006 MT 150, ¶¶ 5, 13, 332 Mont. 421, 138 P.3d 812, we held that plaintiff's legal malpractice claim was time barred, and consistently applied the rules discussed in *Peschel*:

11

> One has discovered, or through the use of reasonable diligence should have discovered, the act, error, or omission, *when one has information of circumstances sufficient to put a reasonable person on inquiry regarding the act or omission*. *Johnson v. Barrett*, 1999 MT 176, ¶ 11, 295 Mont. 254, ¶ 11, 983 P.2d 925, ¶ 11. This test requires knowledge of the facts essential to the legal malpractice claim, rather than the discovery of legal theories. *Johnson*, ¶ 11. Specifically, the court determines whether the plaintiff had "the opportunity to obtain knowledge from sources open to his or her investigation at that time or shortly thereafter[.]" *Johnson*, ¶ 15 (internal quotation omitted).

*Guest*, ¶ 5 (emphasis added). As in *Peschel*, we rejected Guest's argument that he "lacked the legal expertise to know he may have had a malpractice claim" any earlier, noting that this was "irrelevant" to the proper analysis. *Guest*, ¶ 8 (citing *Johnson*, ¶ 11). We stated that "Guest's contention that the statute of limitations cannot begin to run until he 'realized the acts and omissions complained of constituted legal malpractice[,]' is incorrect." *Guest*, ¶ 8. Likewise, the Court's conclusion here that "Ehrman did not know, nor should he have known, of KVHR's alleged negligent act until August 2007" is clearly incorrect. Opinion, ¶ 18. In August 2007 Ehrman learned that he had lost before the district court and that his attorney may have committed malpractice; but long before August 2007 he clearly knew of the *facts*—of the actions taken by his attorney. The Court's reasoning implies that until August 2007, when the District Court ruled, the facts putting Ehrman on inquiry could not have been known.

¶27 The precise issue under our law is when Ehrman had "information of circumstances sufficient to put a reasonable person on inquiry" concerning his attorney's advice, not when he became aware that he had a viable malpractice claim. *Guest*, ¶ 5; *Peschel*, 232 Mont. at 525, 760 P.2d at 56. Ehrman had more than enough information to put a reasonable person

on inquiry about his attorney's actions long before August 2007—he had it more than 3 years before his filed suit against KVHR. The Court overlooks many of these critical facts in its analysis.

¶28 KVHR prepared the lease agreement for Ehrman which was signed in June 2002. Over three years lapsed before Ehrman again sought counsel from KVHR, during which time KVHR heard nothing about the situation and took no action. However, much happened with Ehrman during this hiatus. As the Court notes, in late 2003 or early 2004, new owner Myers told Ehrman he would never consent to assignment of the dock rights to Ehrman and began to harass Ehrman and his guests when they used the dock. At that point, in July 2004, over two years after KVHR's latest involvement, Ehrman took action for himself by recording his lease agreement, a fact the Court ignores. Ehrman acknowledges that he was aware by this time that Myers was never going to provide consent. And then, as Ehrman testified in his deposition, "things got crazy":

> A. . . .When [Myers] found out I got it recorded, then things got crazy. Then he was harassing us. He was taking pictures of -- Every time we'd take the boat out he was there with his camera taking pictures and making threats and all kinds of things. He was really hot and mad, but that didn't happen until about the time I recorded the [lease agreement].
>
> Q. Do you have knowledge that Mr. Myers became aware of your recording and that's what triggered his hostility?
>
> A. Yes.
>
> Q. Did he tell you that?
>
> A. Yes.

13

¶29    The events over these years would have put a reasonable person "on inquiry" that there was a problem with the lease agreement—especially after "things got crazy." The lease was premised upon obtaining Myers' consent and, clearly, that was not going to happen. Myers said he would never consent to lease of the dock rights to Ehrman and actively opposed Ehrman's use of the dock. Significantly, all of this occurred during the three years that KVHR was not involved in the matter. The Court reasons that "[i]n the midst of representation, a client should not be required to sue his or her attorney for malpractice merely because the opposing party has presented countervailing arguments." Opinion, ¶ 17. However, this matter was *not* in litigation when "things got crazy," and KVHR was not then actively representing Ehrman. Ehrman, who was handling things for himself, including recording the lease, then faced a decision: with litigation appearing to be necessary, should he go back after a three-year hiatus to KVHR, who had written the apparently unworkable lease, or should he seek other counsel? Despite being put "on inquiry" about a problem, Ehrman returned to KVHR without seeking another opinion.

¶30    The Court relies heavily upon *Estate of Watkins v. Hedman, Hileman, & Lacosta*, 2004 MT 143, 321 Mont. 419, 91 P.3d 1264, but that case is clearly distinguishable from the circumstances here, as we have previously explained. *See Guest*, ¶ 9 (citing *Watkins Trust v. Lacosta*, 2004 MT 144, ¶¶ 12, 43, 321 Mont. 432, 92 P.3d 620).[1] We rejected Guest's reliance on *Watkins Trust* because the "highly complex" estate and tax planning issues at

---

[1] *Estate of Watkins* and *Watkins Trust* arose from the same factual scenario, both alleging legal malpractice, but were brought separately due to conflicting expectations created by the alleged

14

issue in *Watkins Trust* would have been " 'very difficult for the average layperson to understand.' " *Guest*, ¶ 9 (quoting *Watkins Trust*, ¶¶ 12, 43); *see also Estate of Watkins*, ¶¶ 9, 22-23. Further, we acknowledged the role of concealment in the *Watkins* cases. *Watkins Trust*, ¶¶ 44-47; *Estate of Watkins*, ¶¶ 24-27. Such concealment has not been alleged here. Importantly, in *Guest* we emphasized that, even under *Watkins Trust*, "the analysis still focuses on 'when the facts should have been knowable[;]' not when the trustee should have known that a potential malpractice claim existed." *Guest*, ¶ 9 (quoting *Watkins Trust*, ¶ 41). The subject matter here was not so complex that Ehrman could not see that there was a problem with the lease, as the facts clearly showed.

¶31 In *Schneider v. Leaphart*, 228 Mont. 483, 484-85, 743 P.2d 613, 614 (1987), the lawyer drafted an agreement which was entered in November of 1979 and the client learned, at least by December of 1981, that the agreement was apparently in error. Litigation with the other contract party ensued, wherein the client was presumably represented by the same lawyer who drafted the agreement. *Schneider*, 228 Mont. at 485, 488, 743 P.2d at 615-16. The court ruled against the client, who then brought a malpractice action against the lawyer in March 1985, more than three years after learning of the problem with the agreement. *Schneider*, 228 Mont. at 485-86, 743 P.2d at 615. The district court dismissed the action pursuant to the three-year statute of limitations. *Schneider*, 228 Mont. at 486, 743 P.2d at 615. On appeal, the client, Schneider, urged this Court to adopt the "continuous representation" doctrine for legal malpractice claims, so that the statute of limitations would

malpractice. *Watkins Trust*, ¶ 14. In both *Watkins* cases we reversed the district courts' holdings

15

be "tolled until such time as an attorney ceases to represent a plaintiff." *Schneider*, 228 Mont. at 488, 743 P.2d at 616.

¶32 We rejected Schneider's argument, concluding that the continuous representation doctrine was inconsistent with § 27-2-206, MCA, the statute of limitations for legal malpractice actions, and our previous holdings: "[T]his Court has noted that '[s]ection 27-2-206, MCA does not suspend accrual until the 'attorney-client' relationship has been terminated.' " *Schneider*, 228 Mont. at 488, 743 P.2d at 616-17 (quoting *Burgett*, 204 Mont. at 174, 663 P.2d at 334).

¶33 However, the Court today essentially overturns these cases and adopts the continuous representation doctrine—but without explicitly saying so. The Court tolls the statute of limitations on the basis that "Ehrman testified he wholly relied on" his attorney's advice. Opinion, ¶ 18. If all a client must do is assert that he "wholly relied" upon his attorney's advice in order to toll the statute of limitations, such a low threshold will result in tolling the statute for every claim, despite the Court's assertion that the client's right to rely upon the attorney's advice is "not absolute." Opinion, ¶ 17. For all practical purposes, this holding indeed makes the right absolute and adopts the continuous representation doctrine. Despite stating that this issue will be decided on a "fact-intensive inquiry particular to each case," Opinion, ¶ 17, the Court ignores all the facts about Ehrman's actions and knowledge and simply accepts his statement that he "wholly relied on" his attorney's advice. Opinion, ¶ 18.

---

that the actions were time barred. *Watkins Trust*, ¶¶ 53-54; *Estate of Watkins*, ¶¶ 34-35.

16

¶34 We adopted the "two-track" approach for criminal defendants in *Ereth v. Cascade County*, 2003 MT 328, ¶ 26, 318 Mont. 355, 81 P.3d 463. We concluded this approach was superior "because it incorporates a strict reading of the statute of limitations that at the same time addresses the problems posed by multiple litigations." *Ereth*, ¶ 26. We said that "in order to put counsel on notice that he or she will have to defend against a malpractice claim, and thereby honor the policies underlying the statute of limitations, we hold that a criminal defendant must file a malpractice complaint within three years of discovering the act, error or omission." *Ereth*, ¶ 26. The policy reasons supporting adoption of the two-track rule in *Ereth* support the same application of our law here. Further, affirming the District Court honors § 27-2-206, MCA.

¶35 Lastly, I concur with KVHR's argument regarding the accrual rule. Ehrman lost the quiet enjoyment of his asserted use privileges and was thus damaged long before the district court ruled against him in August 2007. The trouble he suffered motivated him to record the lease agreement in July 2004, in an effort to bolster his claim to the dock. From 2004 to 2007 he did not enjoy peaceable use of the dock. The rights he thought he had obtained under the lease were clearly threatened, and he was damaged at that time.

¶36 The Court has failed to honor our precedent by issuing a decision which is inconsistent with cases such as *Peschel*, *Guest*, *Leaphart*, and *Burgett*. I believe this decision will cloud this area of the law. I would affirm.

/S/ JIM RICE

17

Justice Patricia O. Cotter joins the dissenting Opinion of Justice Rice.


/S/ PATRICIA COTTER